THE STATE OF OHIO, APPELLEE, *v.* WILSON, APPELLANT.

(No. 71-503—Decided March 15, 1972.)

*Mr. Simon Leis, Jr.,* prosecuting attorney, and *Mr. Robert K. Sachs,* for appellee.

*Mr. Richard D. Haney* and *Mr. Arnold S. Levine,* for appellant.

SILBERT, J. In substance, the appellant assigned six errors for consideration by the Court of Appeals, which he renews as propositions of law in his argument here:

1. "Where the state * * * in a criminal case has in its possession certain evidence which * * * has not been made available to the defendant it is * * * [error] to overrule a motion for a bill of particulars * * * [seeking to obtain] a detailed statement of the particular acts, conduct, methods, manner or means by which the state claims the defendant committed the alleged act [,] and it is further error * * * to overrule a motion for discovery and inspection * * * [seeking to permit] the defendant or his counsel * * * to inspect, copy and * * * subject to scientific analysis certain evidence in the hands of the prosecution."

2. "It is the duty of the State of Ohio [and error not] to provide separate trials in a first degree murder case, one trial to be determinative of the guilt * * * or innocence of the defendant and the second hearing or trial to determine the degree of guilt * * * or * * * [whether mercy should be extended] to a defendant."

3. "Where a prospective juror indicates a general

opposition to 'capital punishment' although indicating that she could vote for the death penalty in a proper case, it is error for the court to exclude said juror for cause * * * in a capital case.''

4. ''Where two or more persons are being tried * * * at the same time [for their respective roles in the same criminal act] it is * * * [error] to permit the prosecutor or the counsel for the defense to transfer exhibits from one cause to the other without properly seeing to the security of the exhibits.''

5. ''Where two [defendants] are being tried in separate court rooms for [the] commission of the same crime, it is error for the court * * * to permit the introduction of evidence relating solely to the * * * [defendant] on trial in * * * [the other] court room.''

6. ''Where the evidence given * * * contains discrepancies in the testimony * * * and where the testimony is not of such probative value as required to sustain a verdict of guilty of murder in the first degree without recommendation of mercy [,] it is error * * * not to grant a motion for a new trial timely filed.''

The first and second issues raised require only brief comment. The nature of the first of these is indicated by the following excerpt from appellant's brief:

''It is submitted that the overruling of * * * [these] Motions was prejudicial error * * * since * * * [this] prevented Appellant from receiving due process of law * * *. It is *possible* that there *might have been* evidence acquired at the scene by the prosecutor *which might have conclusively shown or could have led to other facts which might conclusively have shown* that the Appellant was not involved in the murder of the decedent.'' (Emphasis added.)

Appellant admits that the trial court did not overrule his motion in its entirety. The court did grant that part of the motion requiring the state to specify the nature of the offense charged, but the court refused to grant that part of the motion for a bill of particulars and the whole of the so-called Motion for Discovery and Inspection, as they

amounted to a "fishing expedition" intended to force the state to disclose its evidence. Such is not a proper function of a bill of particulars, and if the scope of discovery permitted in criminal cases is limited and properly within the sound discretion of the trial court, this raises no problem of constitutional dimensions. R. C. 2941.07. Cf. *State* v. *DeRighter* (1945), 145 Ohio St. 552, 556; *State* v. *Petro* (1947), 148 Ohio St. 473; *State* v. *Hill* (1967), 12 Ohio St. 2d 88, 90; *State* v. *Laskey* (1970), 21 Ohio St. 2d 187, 192.

Likewise, the second issue, the question of the need for the so-called bifurcated trial was considered by the United States Supreme Court's decision in *McGautha* v. *California* (1971), 402 U. S. 183, 28 L. Ed. 2d 711, which upheld this court's decision in *State* v. *Crampton* (1969), 18 Ohio St. 2d 182. As appellant admits, the issue is completely disposed of by those cases.

Turning to the third issue raised, this court has recently held that a venireman may not be excused for cause in a capital case simply because he has voiced general objections to the death penalty or has expressed conscientious or religious scruples against its infliction. *State* v. *Watson* (1971), 28 Ohio St. 2d 15; approved and followed in *State* v. *Patterson* (1971), 28 Ohio St. 2d 181. Applying the decisions of the United States Supreme Court in *Witherspoon* v. *Illinois* (1968), 391 U. S. 510; *Boulden* v. *Holman* (1969), 394 U. S. 478; and *Maxwell* v. *Bishop* (1970), 398 U. S. 262, in light of *State* v. *Pruett* (1969), 18 Ohio St. 2d 167, reversed, 403 U. S. 946, 29 L. Ed. 2d 857; and *State* v. *Wigglesworth* (1969), 18 Ohio St. 2d 171, reversed, 403 U. S. 947, 29 L. Ed. 2d 857, the court indicated that:

"Upon examination of a prospective juror * * * the most that can be demanded * * * is *that he be willing to consider all of the penalties provided by state law, and that he not be irrevocably committed * * * to vote against the penalty of death* regardless of the facts and circumstances which might emerge * * *." (Emphasis added.) *State* v. *Watson, supra*, paragraph four of the syllabus.

That language was not meant to imply that qualms

208

about capital punishment are a passkey to the jury box. The essential holding of the *Witherspoon, Boulden* and *Maxwell* decisions prohibits carrying out a sentence of death:

"* * * if the jury that imposed or recommended it was chosen by excluding veniremen for cause *simply because* they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." (391 U. S., at 522; emphasis added.)

And this is so because:

"* * * *it cannot be supposed that* once such people take their oaths * * * *they will be unable 'to follow conscientiously the instructions of the trial judge* and to consider fairly the imposition of the death sentence in a particular case.' " 398 U. S. 265, citing and quoting from the decision in *Boulden, supra,* at 484. (Emphasis added.) Cf., also, the language used by this court in paragraph two of the syllabus in *Watson.*

In sum, *Witherspoon, Boulden* and *Maxwell* rejected the theretofore common, statutory and usually irrebuttable presumption that a person who expresses a fixed opinion against or claims he does not believe in capital punishment is not capable of properly acting as a juror in a capital case, since a prospective juror "might nevertheless be perfectly able as a juror to abide by existing law * * *." (394 U. S., at 484.) But because the Supreme Court's language is couched in such terms, emphasizing the juror's duties, we cannot conclude that the court meant to raise a new and contrary presumption, inviolate against an actual showing that a prospective juror is unable or would not abide by his duties, whether or not this results from conscientious or religious scruples concerning capital punishment.

During the course of the *voir dire* examination, Mrs. Antoinette Ernstes, a prospective juror, was examined, and answered, as follows:

"Q * * * Are you opposed to capital punishment * * *?
"A I have been all along, yes.

"Q. You are opposed?

"A Yes, I am.

"Q Then if you were seated as a juror * * * would you be unable to join in a verdict * * * [imposing a penalty of death]?

"A After hearing the evidence and knowing the feeling that he was guilty, *I think I could go along with it*, but I don't think I would propose it myself. [Emphasis added.]

"* * *

"Q * * * can you sign * * * [a] verdict form knowing that your signature along with the other 11 is going to result in this man going to the electric chair?

"A Well, like I stated first, *if* I felt like this man was guilty and they were—*we all signed our names, I would sign mine too.* [Emphasis added.]

"* * *

"Q If you thought he was guilty and had been proven guilty beyond a reasonable doubt and some other juror's opinion was that he hadn't been proven guilty beyond a reasonable doubt, would you stick to your opinion that he was guilty?

"A I still feel like I would recommend mercy if someone else or just—*I think I would kind of go along with this person too*, be more or less for the mercy sentence over the death sentence." (Emphasis added.)

The prosecutor then challenged Mrs. Ernstes for cause. The challenge was not based upon her opposition to capital punishment, *per se*, but on the ground that "she would be unable to follow the law, she would go along with the other jurors, and that's not the law." Before ruling on the challenge, the court addressed Mrs. Ernstes, and she answered, as follows:

"The Court: * * * If all of the evidence warranted a finding of guilty of first-degree murder and there was nothing in the evidence that warranted a recommendation of mercy and you felt that way, that was your opinion of the evidence and applying the law to the evidence, and that would be your determination of the case supposing one

or two other jurors didn't feel that way and wanted to recommend mercy, *would you in spite of your feelings that mercy should not have been recommended go along with the jurors who felt that mercy should have been recommended simply because of your feelings about capital punishment?* [Emphasis added.]

"The witness: *I guess I would go along with that.*" (Emphasis added.)

In *Witherspoon*, the defendant was convicted by a jury selected under a statute which had been interpreted as permitting the exclusion of any juror who "might hesitate to return a verdict inflicting [death]." Nearly half of the veniremen were eliminated. (391 U. S., at 512-513.) The trial court in *Boulden* excused 15 prospective jurors as having "a fixed opinion against" capital punishment; 11 were excused after only having answered one question framed in the language of the statutory test. (394 U. S., at 482-483.) At least four prospective jurors were dismissed in *Maxwell* in what the court termed "possible violations of the Witherspoon rule." (398 U. S., at 265, fn. 2.) The court focused on only three of these violations. One prospective juror testified that he "thought" he "might" have conscientious scruples which would prevent him from concurring in a verdict imposing capital punishment. Another merely testified that he "entertained * * * conscientious scruples about imposing the death penalty." The third was dismissed after simply stating that he did not believe in capital punishment. (398 U. S., at 264-265.)

The case at bar involves no wholesale abuse of jury selection to "stack * * * the deck against the" defendant by assuring "a hanging jury [which] cannot be squared with the Constitution." (391 U. S., at 523.) Nor does it involve the summary dismissal of any juror on a bare statement that he or she objected to the death penalty or had conscientious or religious scruples against inflicting it. For all the record shows, Mrs. Ernstes was the only prospective juror who expressed any objection to capital punishment and who was challenged for cause. The challenge was not

based upon her views concerning capital punishment, *per se*, but on a firmer foundation, *i. e.*, that her testimony indicated she would be unable to weigh the evidence and determine whether mercy was justified, but would instead acquiesce in whatever decision her fellow jurors were inclined to reach.

It has long been settled in this state that a ruling on a challenge for cause will not be overturned unless it appears that the trial court thereby abused its discretion. *State* v. *Vails* (1970), 22 Ohio St. 2d 103, 105. Cf. *Serviss* v. *Stockstill* (1876), 30 Ohio St. 418, and *Dew* v. *McDivitt* (1876), 31 Ohio St. 139. Stated differently, in the context of this case, we will not second-guess the trial court's implicit determination that Mrs. Ernstes would not be capable of applying the law in determining punishment, inasmuch as this determination is not manifestly arbitrary, being supported by substantial testimony given by Mrs. Ernstes. Cf. *Palmer* v. *State* (1885), 42 Ohio St. 596, and *Lingafelter* v. *Moore* (1917), 95 Ohio St. 384.

Upon the defendant's election to be tried by a jury, both the defendant and the state were entitled to a panel of jurors who would abide by their oaths, individually, to "well and truly try, and true deliverance make between the State * * * and the defendant * * *." R. C. 2945.28. Both were entitled to a trial before an impartial jury—impartial in the sense that each juror held no bias for or against the state or the defendant (*Palmer* v. *State, supra*; *Lingafelter* v. *Moore, supra*), and impartial as well in that each would accept the law given him by the court, weigh the evidence, and apply the law to the facts as he believed them to be true, accepting the decision of the jury as his within the privacy of his own conscience. Cf. R. C. 2313.42.(J) with 2945.25.(B) and 2945.11. See, also, *Frazier* v. *State* (1873), 23 Ohio St. 551, and the cases just cited. Cf., also, *Liska* v. *State* (1926), 115 Ohio St. 283, 285; *Blair* v. *State* (1891), 5 C. C. 496, 504-505; and *Ohio* v. *Smith*, Tappan (1818) 225, 261. (We note in passing that the holding in paragraph one of the syllabus in *State* v. *Huffman* [1912], 86

Ohio St. 229, as applied to the facts in that case, has been narrowed in practice by recent decisions, including the case at bar, redefining the grounds upon which a juror may be challenged for cause in light of the *Witherspoon* decision.)

While the effect of not discharging a juror may differ, the underlying problem involved in this case is not different from the issue presented when a prospective juror testifies that he is so strongly opposed to capital punishment that he would be unable to concur in or consider imposing the death penalty. Compare the facts in *State* v. *Eaton* (1969), 19 Ohio St. 2d 145, and *State* v. *Patterson,* *supra* (28 Ohio St. 2d 181). In either instance, the prospective juror indicates that he would abdicate his duty as a juror by refusing to assume responsibility for the verdict, assuaging his conscience by devolving his responsibility onto his fellow jurors, or by refusing to reach any conclusion save that which was predetermined by conscience. Nor is the *ratio decidendi* of the *Witherspoon* decision less applicable in the case at bar:

"A man who opposes the death penalty * * * can * * * obey the oath he takes as a juror. * * * Guided by neither rule nor standard, 'free to select or reject as it [sees] fit,' *a jury* that must choose between life imprisonment and capital punishment *can do little more—and must do nothing less—than express the conscience of the community on the ultimate question of life or death.*" (391 U. S., at 519; emphasis added.)

If a jury cannot "express the conscience of the community" unless it is drawn from a cross-section of the community, neither will it do so if one or more of its members will refuse to permit that conscience to be expressed or if one, two, or maybe more—possibly even eleven—would abdicate their individual responsibility to others—or in an extreme case to only one of their number—whose individual wills cannot reasonably be expected to be representative of the conscience of the community. We conclude, therefore, that the trial court may properly exclude a prospective juror in a first-degree murder case where it appears that

he or she could not exercise his or her own independent judgment, although that is the result of conscientious or religious scruples concerning capital punishment, but would instead defer to the judgment of his or her fellow jurors.

With regard to appellant's fourth contention, the safe custody and control of exhibits, once admitted, is a matter falling largely within the sound discretion of the trial court. Compare discussion of implied powers found in *State, ex rel. Hawke,* v. *LeBlond* (1923), 108 Ohio St. 126, 135-136. The record in this case indicates that in several instances it was necessary to remove several of the exhibits, and they were temporarily replaced by photographs. Appellant does not claim that there was any misconduct with regard to the exhibits or that this procedure worked to his prejudice in any way—save in that he sees it as "fraught with the *possibility* of error" (emphasis added), and thereby prejudicial to his rights. Insofar as appears of record, in each instance the actual exhibits and not the photographs were used in court, and the actual exhibits, not the photographs, were taken by the jury into their deliberations. At no time does it appear that the substitution was discussed in the presence of the jury. In short, the photographs were used to assure the security of the exhibits and for no other purpose, to permit simultaneous trials of both the defendant and his brother in different court rooms—to assure both the defendant and his brother fair and impartial trials. Under the circumstances, we find no abuse of discretion and no prejudice to the rights of the defendant.

The record does not support the last two issues appellant raises. The circumstantial evidence introduced with regard to appellant's brother did not relate solely to his brother but tied the two brothers together as jointly involved in the killing of the deceased in a robbery of his place of business. Likewise, for the same reasons and on the basis of the evidence as set out earlier, we believe that the verdict of the jury is supported by substantial probative evidence of guilt sufficient to support the defendant's conviction. The trial court did not abuse its discretion in

refusing to grant a new trial. *State* v. *Sheppard* (1956), 165 Ohio St. 293, paragraph six of the syllabus, applied in light of *Atkins* v. *State* (1927), 115 Ohio St. 542, approved and followed; *State* v. *Petro, supra* (148 Ohio St. 473); and *State* v. *Butler* (1967), 11 Ohio St. 2d 23, 31-32.

For the reasons given, we find that none of the propositions of law is well taken. The judgment of the Court of Appeals, affirming the judgment and sentence of the Court of Common Pleas of Hamilton County, is affirmed.

*Judgment affirmed.*

O'NEILL, C. J., SCHNEIDER, HERBERT, CORRIGAN, STERN and LEACH, JJ., concur.

SILBERT, J., of the Eighth Appellate District, sitting for DUNCAN, J. JUDGE SILBERT of the Court of Appeals was, pursuant to Section 2 of Article IV of the Constitution of Ohio, duly directed by the Chief Justice "to sit with the justices of the Supreme Court in the place and stead of" JUSTICE DUNCAN and JUDGE SILBERT did so and heard and considered this cause prior to the resignation of JUSTICE DUNCAN on November 28, 1971.